AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| In the Matter of the Extradition of Dimitrios Moulatsiotis | ) | Case No. |
| | ) | 4:21-mj-71102 MAG |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

**FILED**

Jul 09 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## AMENDED CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___2012 through 2017___ in the county of ___Germany___ in the

District of _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 3184 | Being a fugitive from Germany, which has sought his provisional arrest with a view towards extradition on the charges of fraud on a commercial basis and as a member of a gang, in violation of section 263 (1) (5) of the Criminal Code of Germany, pursuant to the extradition treaty between the United States and Germany, and Title 18 U.S.C., Section 3184. |

This criminal complaint is based on these facts:

See attached Amended Complaint of AUSA Maureen C. Bessette

☐ Continued on the attached sheet.

*Maureen C. Bessette* /s/
*Complainant's signature*

Approved as to form *Maureen C. Bessette*
AUSA Maureen C. Bessette

Maureen C. Bessette, Assistant US Attorney
*Printed name and title*

Sworn to before me by telephone.

Date: ___07/09/2021___

*Susan van Keulen*
*Judge's signature*

City and state: ___San Jose, California___

Hon. Susan Van Keulen, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In the Matter of the Extradition of          Case No.: 4:21-mj-71102 MAG
DIMITRIOS MOULATSIOTIS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**AMENDED COMPLAINT**
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.      In this matter, I represent the United States in fulfilling its treaty obligation to the Federal Republic of Germany ("Germany").

2.      There is an extradition treaty in force between the United States and Germany, the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., June 20,1978, T.I.A.S. No. 9785, *as amended by* the Supplementary Extradition Treaty with the Federal Republic of Germany, U.S.-F.R.G., Oct. 21, 1986, S. Treaty Doc. No. 100-6 (1987), *and* the Second Supplementary Treaty to the Treaty between The United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., Apr. 18, 2006, S. Treaty Doc. No. 109-14 (2006) (collectively  referenced hereafter as the "Treaty")

3.      Pursuant to the Treaty, the government of Germany has submitted a formal request through diplomatic channels for the extradition of Dimitrios Moulatsiotis ("MOULATSIOTIS") from the United States to Germany.

4.      According to the information provided by the Government of Germany, MOULATSIOTIS, a citizen of Greece who formerly resided in Germany, is charged with

1

committing commercially-based and gang-related fraud, in violation of Section 263(1) and (5) of the German Federal Criminal Code.

5.     These offenses were committed within the jurisdiction of Germany.  An investigating judge for the District Court in Kaiserslautern, Germany issued a warrant for MOULATSIOTIS's arrest on February 13, 2018.

6.     The arrest warrant and charges against MOULATSIOTIS are based upon the following facts:

<u>The Alleged Fraud Scheme</u>

a.     German investigators provided evidence that from 2012 through 2017, MOULATSIOTIS, working with others—including Eugen Plaksin, his wife Waltraud Plaksin, their son Erik Plaksin, Amr Hassan Taha Aboueldahab ("Aboueldahab"), Mahmoud Hamad ("Hamad"), and Sapna Rani ("Rani")—engaged in a scheme to defraud parties in Germany, Switzerland, and other European countries, as well as parties in Australia, India, and across the Middle East.  MOULATSIOTIS is alleged to have been the leader of the scheme, in which his coconspirators falsely acted as representatives of investors from the United Arab Emirates and professed to be able to arrange financing for project owners looking for additional capital.

b.     MOULATSIOTIS and his coconspirators collected "security payments" and other "start-up expenses" (*e.g.*, for travel expenses, registration fees, expert opinions, investments, and insurance policies) from those project owners, purportedly required in order to release the investor's funds, but in reality used instead by MOULATSIOTIS and his coconspirators for private purposes and personal profit.  To induce payment, MOULATSIOTIS's co-conspirators made false statements and misrepresentations about

the alleged investors—including representing that a Syrian man whom they paid was an investor "sheikh"—as well as misrepresentations about purported investment partner companies Gulf Holdings and Western Holdings Group, which investigation revealed were simply fake "mailbox" companies.  Eugen Plaksin established relationships with victims, collected payment, and set up meetings for them with representatives of fake investors in the United Arab Emirates ("UAE").  Eugen Plaksin, sometimes also with his wife, accompanied victims to those meetings, which were typically led by Aboueldahab.  Hamad sometimes participated in the meetings as well, pretending to be an advisor for a sheikh, to lend credibility to the meetings.

       c.     The victims directed their payments into accounts for European Technology Trust GmbH ("ETT"), which was controlled by Eugen Plaksin, and EIN International ("EIN"), which was controlled by MOULATSIOTIS and Rani (who served as a secretary for EIN and acted at the direction of MOULATSIOTIS).  Eugen Plaksin kept 20 to 30% of the funds paid into the ETT account and transferred the remainder to EIN.

       d.     MOULATSIOTIS and his coconspirators did not provide financing to the victims as promised.  In fact, the German investigation did not identify any project for which financing was provided.  Instead, MOULATSIOTIS and his coconspirators falsely claimed project delays and ultimately project failure as a means to keep the security payments from victim project owners and to generate additional payments.

       e.     The German authorities have identified 27 such victims, with damages totaling $2,769,810.11 USD. MOULATSIOTIS and his coconspirators have not reimbursed any victims for their security payments or any other expenses.   Their

3

suspected crimes have led to the financial ruin of many of the victims, and even the suicide of one.

f.      On July 18, 2018, Aboueldahab pled guilty, admitting to the fraudulent scheme as outlined herein, and was sentenced to three years and eight months' imprisonment.  On April 27, 2020, he plead guilty in another proceeding, again admitting to the fraudulent scheme, and was sentenced to four years and nine months' imprisonment.

<u>MOULATSIOTIS' Role</u>

g.      Throughout the entire period, MOULATSIOTIS allegedly directed the scheme from the background, issuing instructions to other members of the conspiracy. For example, he instructed Eugen Plaksin and Aboueldahab to have meetings with victims, provided information that was supposed to be fed to victims, and provided advice to Eugen when questions or problems arose.

h.      MOULATSIOTIS is believed to have taken on this behind-the-scenes, puppeteer role due to his criminal record, which includes a previous conviction in Aachen, Germany for a similar fraud scheme—also involving a fake sheikh and investors from the Arab World—using a company called "Eurolink."  Aboueldahab and Rani also participated in that scheme.  MOULATSIOTIS was sentenced to 9 months' imprisonment based on that conviction in 2005.

<u>Evidence Against MOULATSIOTIS</u>

i.      Witnesses have outlined the scheme by MOULATSIOTIS' co-conspirators to solicit advanced payments for false investment opportunities, and the role of a "mentor," operating as puppeteer in the background.  One witness, Maria Nadja Meehan ("Meehan"),

4

who worked for Eugen and Erik Plaksin earning commissions on projects in need of financing that she referred to them, testified that Eugen Plaksin frequently consulted via telephone with a "mentor" or advisor (later identified as MOULATSIOTIS), to whom he referred as "doctor," during meetings with victims.[1]  According to Meehan, Eugen Plaksin said that his mentor/advisor was an expert in German law who had assisted him in setting up the business model and "helped a lot."  In one instance, according to Meehan, when there was a meeting in Dubai about a problem with a victim project, Plaksin called his mentor from his mobile phone and spoke to him in German.  When the call ended, Plaksin said his mentor had made a proposal, which involved new expenses and fees.

j.      German authorities obtained additional evidence against MOULATSIOTIS, including bank documentation, telephone records, and other records obtained via search warrant.  The bank documentation revealed that the money collected by MOULATSIOTIS and his co-conspirators was not used as claimed to victims, but was instead used for private purposes.

k.      Recordings of conversations through a wiretap captured MOULATSIOTIS's voice and reveal the fraudulent scheme and processes generally, as well as MOULATSIOTIS's role as the leader of the enterprise.  For example, conversations between MOULATSIOTIS and Eugen Plaksin discussing the scheme were captured by law enforcement via wiretap, and reveal MOULATSIOTIS setting new conditions to which alleged pay-out of investments would be subject.

l.      Text messages implicating MOULATSIOTIS were also recovered. MOULATSIOTIS's phone number was identified after a search of the Plaksin residence in

---

[1] During telephone calls intercepted by law enforcement, "doctor" was the standard manner of address for MOULATSIOTIS.

May 2017. During the search, it was discovered that a phone number for "Dr. Moulatsiotis" was listed as a contact in Waltraud Plaksin's phone.  Waltraud told law enforcement that "Dr. Moulatsiotis" was her doctor.  While the police were searching the residence, Waltraud contacted MOULATSIOTIS via Whatsapp to inform him that the police were there.

m.      Text messages were recovered between Eugen Plaksin and MOULATSIOTIS on the same phone number listed for MOULATSIOTIS in Waltraud Plaksin's searched phone.  These text messages are explicitly addressed to "Dr. Moulatsiotis."  The substance of them relates to the alleged fraud scheme and appears to involve Eugen Plaksin reporting back to MOULATSIOTIS.  For example, on May 15, 2017, Eugen Plaksin texts: "Hello, Dr. Moulatsiotis, Have just spoken with Mr. Philp.  In approx.. 24 hours, the 190k for the purchase of the property and following a further 24 hours, the 29K to cover the closing expenses are to arrive in the [ETT] account.  With best wishes, Eugen Plaksin."  Bruce Philp ("Philip") is an identified victim who was defrauded of $527,000.

n.      In recorded phone calls, Eugen Plaksin also called MOULATSIOTIS on the phone number listed for him in Waltraud Plaksin's searched phone, regarding the criminal investigation and the fact that searches had been conducted, computers and phones seized, together with "funds that we had put aside."  MOULATSIOTIS, who self identified ("Yes, this is Moulatsiotis."), responded "Yeah, but they can't keep the money.  They can't confiscate any money."  They also discussed details regarding their scheme, including references to victim Philp and money that was to be transferred that day for the property, and later for closing expenses.

o.      MOULATSIOTIS's involvement in the criminal scheme is also evidenced by the fact that he held a German account into which money was paid from an account for EIN, the same account into which numerous victim payments were made.  In addition,

MOULATSIOTIS has two other accounts in Germany, with Commerzbank AG and Deutsche Postbank AG, into which funds from the UAE, including from victims, have been deposited. MOULATSIOTIS has used that money for private purposes, such as insurance, garage rent, and credit card payments.

7.     MOULATSIOTIS may be found within the jurisdiction of this Court at 147 Hagar Avenue, Piedmont, California 94611.

8.     Tom Heinemann, an Assistant Legal Adviser in the Office of the Legal Adviser for the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition of MOULATISIOTIS was made and a copy of the Treaty, stating that the offenses for which extradition is demanded are provided for by the Treaty, and confirming that the documents supporting the request for extradition bear the certificate or seal of Germany's Federal Ministry of Justice, or Ministry of Department responsible for foreign affairs, in accordance with Article 29 of the Treaty, so as to enable them to be received into evidence.

9.     The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from Germany, a copy of the Treaty, and the certified documents submitted in support of the request, are filed with this complaint and incorporated by reference herein.  *See* Exhibit 1.

10.    MOULATSIOTIS would be likely to flee if he learned of the existence of a warrant for his arrest.

11.    WHEREFORE, the undersigned requests that a warrant for the arrest of MOULATSIOTIS be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Germany, so that the fugitive may be arrested and brought before

this Court to the end that the evidence of criminality may be heard and considered, and that this amended complaint be placed under the seal of the Court until such time as the warrant is executed.

/s/ *Maureen C. Bessette*

MAUREEN C. BESSETTE
Assistant United States Attorney

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this <u>9th</u> day of July 2021. This application be filed under seal.

HON. SUSAN VAN KEULEN
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1



DISTRICT OF COLUMBIA, ss:

## DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am the Assistant Legal Adviser for the Office of Law Enforcement and Intelligence in the Office of the Legal Adviser of the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Dimitrios Moulatsiotis. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States of America and the Federal Republic of Germany are found in the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, signed on June 20, 1978 (the "1978 Treaty"), the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, signed October 21, 1986 (the "1986 Supplementary Treaty"), and the Second Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, signed on April 18, 2006 (the "2006 Second Supplementary Treaty"). Copies of the treaties are attached to this declaration.

3. In accordance with the provisions of the treaties, the Embassy of the Federal Republic of Germany has submitted Diplomatic Note number 56/2018, dated June 6, 2018, requesting the extradition of Dimitrios Moulatsiotis. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 30 of the 1978 Treaty, the Government of the United States represents the interests of Germany in proceedings in U.S. courts arising out of extradition

19036457-2

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...ify That Tom Heinemann, whose name is subscribed to the document hereunto annexed, was ... e of subscribing the same Assistant Legal Adviser, Office of the Legal Adviser, Department ... United States of America, and that full faith and credit are due to his acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*



In testimony whereof, I, Michael R. Pompeo, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this thirteenth day of May, 2019.

*Issue ... uant to CHXIV. Stat ...*
*Sept. ... 789, 1 Stat. 68-69;*
*USC ... 22USC 2651a; 5 U ...*
*301; ... T 1733 et. seq.; 8 US ...*
*1443( ... LE 44 Federal Rules ...*
*Civil ... lure.*

_____
Secretary of State

By _____
Assistant Authentication Officer,
Department of State

MOULATSIOTIS-EXT-00002



- 2 -

requests made by Germany, and Germany provides similar representation in its courts for extradition requests made by the United States.

5. The offense for which extradition is sought is covered by Article 2 of the 1978 Treaty, as amended by Article 1 of the 1986 Supplementary Treaty.

6. Under Article 29 of the 1978 Treaty, as amended by Article 6 of the 2006 Second Supplementary Treaty, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements for extradition without the need for certification by the U.S. Embassy in Berlin. Germany, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the treaty's provision on authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 10th, 2019.

TOM HEINEMANN

Attachments:
1. Copy of note
2. Copies of treaties

MOULATSIOTIS-EXT-00003

Embassy
of the Federal Republic of Germany
Washington

L/LEI

2018 JUN -6 A 10 46

DEPARTMENT OF STATE

Please refer in reply: RK 531.41 SE Moulatsiotis

### *Note Verbale 56/2018*

The Embassy of the Federal Republic of Germany presents its compliments to the US Department of State and, referring to Art. 29 of the Extradition Treaty between the Federal Republic of Germany and the United States of America of 1978 in the version of the Second Supplementary Agreement to the Extradition Treaty of 2006, has the honor to ask the United States

- to extradite the Greek citizen Dr. Dimitrios Moulatsiotis, born on June 13, 1963, in Athens, Greece, presently presumably residing at 4715 Blue Mountain Drive/4495 Avenida De La Luz, Yorba Linda, CA, to be prosecuted for the crimes cited in the arrest warrant of the District Court of Kaiserslautern, case number 2a Gs 287/18, of February 13, 2018,

- to turn over objects found in the possession of the individual if such objects were obtained by the individual through the actions cited in the arrest warrant or if they can serve as evidence,

- to take the individual into detention until extradition,

- upon execution of the extradition, to communicate the dates on which the individual was held in detention following the extradition request.

Germany intends to have the individual picked up by German officers in the US and to fly him to Germany at German government expense. For the handover of the individual, the US is asked to suggest an airport that provides a nonstop air service to Germany.

- 2 -

A copy of this Note Verbale and copies of the relevant judicial documents are included for the US Department of Justice.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the US Department of State the assurances of its highest consideration.

Washington, D.C., June 06, 2018

U.S. Department of State
Office of Law Enforcement
and Intelligence (L/LEI)
2201 C-Street, N.W.
Washington, D.C. 20520



MOULATSIOTIS-EXT-00005

Second Supplementary Treaty

to

the Treaty between the United States of America

and

the Federal Republic of Germany

Concerning Extradition

MOULATSIOTIS-EXT-00006

2

The Government of the United States of America

and

the Government of the Federal Republic of Germany,

As contemplated by Article 3, paragraph (2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"),

Acknowledging that in accordance with the provisions of this Second Supplementary Treaty, the bilateral Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 20 June 1978 as amended by the Supplementary Treaty to the Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 21 October 1986 (hereafter referred to as "the bilateral extradition treaty") is applied in the manner set forth in Article 3 of the U.S.-EU Extradition Agreement,

Have agreed as follows:

Article 1

Pursuant to Article 13 of the U.S.- EU Extradition Agreement, Article 12 of the bilateral extradition treaty is amended to read as follows:

3

"Article 12

Capital Punishment

Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied."


Article 2

Pursuant to Article 14 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 15 bis:

"Article 15 bis

Sensitive information in a request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted."


Article 3

Pursuant to Article 6 of the U.S.-EU Extradition Agreement, the following text is added to the bilateral extradition treaty as the final sentence of Article 16, paragraph (1):

4

"The facilities of the International Criminal Police Organization (Interpol) may be used to transmit such a request."

Article 4

Pursuant to Article 7 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 16, paragraph (5):

"(5) The Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to Article 14, paragraph (1), by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under paragraph (4) of the present Article to enable the person's continued detention. "

The current paragraph (5) is renumbered to become paragraph (6).

Article 5

Pursuant to Article 10 of the U.S.- EU Extradition Agreement, Article 17 of the bilateral extradition treaty is amended to read as follows:

"Article 17
Requests for Extradition or Surrender Made by Several States

(1) If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person either for the same offense or for different offenses, or if the Federal Republic of Germany receives an extradition

5

request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, the competent authority of the executive branch of the Requested State shall determine to which State, if any, it will surrender the person.

(2) In making its decision under paragraph (1) of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

    a)  whether the requests were made pursuant to a treaty;

    b)  the places where each of the offenses was committed;

    c)  the respective interests of the Requesting States;

    d)  the seriousness of the offenses;

    e)  the nationality of the victim;

    f)  the nationality of the person sought;

    g)  the possibility of any subsequent re-extradition between the Requesting States; and

    h)  the chronological order in which the requests were received from the requesting States.

(3) If the Requested State reaches a decision at the same time upon extradition to one of the Requesting States and on re-extradition to another Requesting State, it shall communicate that decision on re-extradition to each of the Requesting States."

Article 6

Pursuant to Article 5, paragraph (2) of the U.S.- EU Extradition Agreement, Article 29 of the bilateral extradition treaty is amended to read as follows:

6

"Article 29

Certification

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and, for the Federal Republic of Germany, the Federal Ministry of Justice."

Article 7

(1) In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall apply to offenses committed before as well as after it enters into force.

(2) This Supplementary Treaty shall not apply to requests for extradition made prior to its entry into force.

Article 8

(1) This Supplementary Treaty shall form an integral part of the bilateral extradition treaty.

(2) This Supplementary Treaty shall be subject to the completion by the United States of America and the Federal Republic of Germany of their respective applicable internal procedures for entry into force. The Contracting Parties shall thereupon notify each other that such internal procedures have been completed.

7

(3)  This Supplementary Treaty shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

(4)  In the event of termination of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall be terminated.

DONE at Washington, this 18th day of April 2006, in duplicate, in the English and German languages, both texts being equally authentic.

For the Government of the
United States of America:

For the Government of the
Federal Republic of Germany:

| 100TH CONGRESS | SENATE | TREATY DOC. |
|---|---|---|
| *1st Session* | | 100–6 |

## SUPPLEMENTARY EXTRADITION TREATY WITH THE FEDERAL REPUBLIC OF GERMANY

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE SUPPLEMENTARY TREATY TO THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE FEDERAL REPUBLIC OF GERMANY CONCERNING EXTRADITION SIGNED AT WASHINGTON ON OCTOBER 21, 1986

Entered into Force on March 11, 1993



### ENGLISH TEXT ONLY

JUNE 25, 1987.—Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate.

---

U.S. GOVERNMENT PRINTING OFFICE

91–118                WASHINGTON : 1987

## LETTER OF TRANSMITTAL

———————

THE WHITE HOUSE, *June 25, 1987.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition signed at Washington on October 21, 1986. I transmit also, for the information of the Senate, the report of the Department of State with respect to the Supplementary Treaty.

The Supplementary Treaty adds to and amends the Treaty Between the United States and the Federal Republic of Germany Concerning Extradition, signed at Bonn on June 20, 1978. It represents an important step in improving law enforcement cooperation and combatting terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists, e.g., murder, manslaughter, kidnapping, use of a destructive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The Supplementary Treaty also will help to improve implementation of the current Extradition Treaty in several other respects.

I recommend that the Senate give early and favorable consideration to the Supplementary Treaty and give its advice and consent to ratification.

RONALD REAGAN.

(III)

# LETTER OF SUBMITTAL

---

DEPARTMENT OF STATE,
*Washington, June 4, 1987.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition signed at Washington on October 21, 1986. I recommend that the Supplementary Treaty be transmitted to the Senate for advice and consent to ratification.

The Supplementary Treaty supplements and amends the Treaty between the United States and the Federal Republic of Germany Concerning Extradition, signed at Bonn on June 20, 1978 (32 UST 1485; TIAS 9785). The Supplementary Treaty Concerning Extradition would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to extradition. It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Supplementary Treaty will help improve implementation of the current Treaty in several other respects.

Article 1(a) of the Supplementary Treaty amends Article 2, paragraph (1) of the current Treaty—the "extraditable offenses" provision—by defining extraditable offenses as offenses which are punishable under the laws of both States, whether dual criminality follows from Federal or State laws. In addition, Article 1(a) of the Supplementary Treaty specifies that dual criminality may include offenses based upon participation in an association whose aims and activities include the commission of extraditable offenses, such as an association involved in racketeering or criminal enterprise under the laws of the United States. Article 1(c) deletes the Appendix to the current Treaty, which lists extraditable offenses.

This amendment furthers the modern practice of permitting extradition for prosecution for any crime punishable under the laws of both contracting Parties for a minimum period of more than one year rather than listing offenses for which extradition may be granted. This obviates the need to renegotiate or supplement the Treaty as new types of criminal activity, such as computer-related crimes or money laundering, become punishable under the laws of both States.

Article 1(b) of the Supplementary Treaty amends Article 6 of the current treaty to specifically enumerate fiscal offenses—offenses in connection with taxes, duties, customs and exchange—for which ex-

MOULATSIOTIS-EXT-00015

VI

tradition may be refused if the competent executive authority determines that extradition for any such offense would be contrary to the public policy or other essential interests of the Requested State. The current treaty contains a similar provision but describes the fiscal offenses by reference to the Appendix to the Treaty.

Article 2 of the Supplementary Treaty effectively limits the scope of Article 4 of the current Treaty—the political offense exception. It amends article 4, paragraph (3) of the current Treaty by specifying additional crimes which shall not be regarded as political offenses: namely, murder; manslaughter; malicious assault; kidnapping; specified explosives offenses; and conspiracy or attempt to commit any of the foregoing offenses.

In addition, the Supplementary Treaty continues a provision, existing in the current Treaty, that excludes from the reach of the political offense exception any offense for which both the United States and the Federal Republic of Germany have an international obligation to extradite the person or submit his case for prosecution; i.e., aircraft hijacking pursuant to the Convention for the Suppression of Unlawful Seizure of Aircraft, opened for signature at The Hague on December 16, 1970; aircraft sabotage pursuant to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, opened for signature at Montreal on September 23, 1973; crimes against internationally protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, opened for signature at New York on December 14, 1973; and hostage taking pursuant to the International Convention against the Taking of Hostages, opened for signature at New York on December 18, 1979. This exclusion will also extend to crimes similarly defined in future multilateral treaties.

Article 3 of the Supplementary Treaty makes an addition to Article 20 of the current Treaty. Article 20 of the current Treaty provides that after a decision on an extradition request has been rendered by a competent court, the Requested State may defer surrender of a person being proceeded against or serving a sentence in the Requested State for a different offense until the proceedings are concluded or the sentence is fully executed. Article 3 of the Supplementary Treaty provides that, alternatively, the Requested State may temporarily surrender the person sought to the Requesting State for prosecution. Therefore, this provision will allow a person serving a long sentence in the Requested State to be tried promptly in the Requesting State and then be returned to complete his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

Article 4 of the Supplementary Treaty provides that the Supplementary Treaty's provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Supplementary Treaty, but shall not apply to an offense committed before the Supplementary Treaty enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article 5 of the Supplementary Treaty provides that the Supplementary Treaty shall also apply to Land Berlin, if the Government of the Federal Republic of Germany does not make a contrary dec-

VII

laration within three months of the date of entry into force of the Supplementary Treaty. Article 33 of the current Treaty is substantively identical.

Article 6(1) of the Supplementary Treaty provides that the Supplementary Treaty shall form an integral part of the current Treaty. Article 6(2) of the Supplementary Treaty provides that it shall enter into force upon the exchange of instruments of ratification and shall be subject to termination in the same manner as the current Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Supplementary Treaty to the State at the earliest possible date.

Respectfully submitted,

GEORGE P. SHULTZ.

SUPPLEMENTARY TREATY TO THE TREATY BETWEEN THE UNITED
STATES OF AMERICA AND THE FEDERAL REPUBLIC OF GERMANY
CONCERNING EXTRADITION

*The United States of America and the Federal Republic of Germany,*

*Desiring* to make more effective the Treaty of June 20, 1978 between the United States of America and the Federal Republic of Germany concerning Extradition (hereinafter referred to as "the Extradition Treaty"),

*Have agreed as follows:*

ARTICLE 1

(a) Article 2, paragraph (1) of the Extradition Treaty is amended to read as follows:

"(1) Extraditable offenses under the Treaty are offenses which are punishable under the laws of both Contracting Parties. In determining what is an extraditable offense it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offense or denominate an offense by the same terminology, or whether dual criminality follows from Federal, State or Laender laws. In particular, dual criminality may include offenses based upon participation in an association whose aims and activities include the commission of extraditable offenses, such as a criminal society under the laws of the Federal Republic of Germany or an association involved in racketeering or criminal enterprise under the laws of the United States."

(b) Article 6 of the Extradition Treaty is amended to read as follows:

"Extradition may be refused for offenses in connection with taxes, duties, customs and exchange if the competent executive authority of the Requested State determines that extradition for any such offense would be contrary to the public policy or other essential interests of the Requested State."

(c) The Appendix to the Extradition Treaty is hereby deleted.

ARTICLE 2

Article 4, paragraph (3) of the Extradition Treaty is amended to read as follows:

"For the purpose of this Treaty the following offenses shall not be deemed to be offenses within the meaning of paragraph (1):

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;

(b) murder, manslaughter, maliciously wounding, or inflicting grievous bodily harm;

(1)

2

(c) kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

(d) placing or using an explosive, incendiary or destructive device capable of endangering life, or of causing grievous bodily harm, or of causing substantial property damage;

(e) an attempt or conspiracy to commit, or participation in, any of the foregoing offenses."

### ARTICLE 3

The title of Article 20 of the Extradition Treaty is amended to read as follows: "Temporary or Deferred Surrender." The text of Article 20 is renumbered to become Article 20, paragraph (1), and the following text is inserted as Article 20, paragraph (2):

"(2) Alternatively, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Contracting Parties."

### ARTICLE 4

This Supplementary Treaty shall apply to any offense committed, and to any request made, or to any person found extraditable, before or after this Supplementary Treaty enters into force, provided that this Supplementary Treaty shall not apply to an offense committed before this Supplementary Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

### ARTICLE 5

(1) This Supplementary Treaty shall also apply to Land Berlin provided that the Government of the Federal Republic of Germany does not make a contrary declaration to the Government of the United States of America within three months of the date of entry into force of this Supplementary Treaty.

(2) Upon the application of this Supplementary Treaty to Land Berlin, references in the Supplementary Treaty to the Federal Republic of Germany or to the territory thereof shall be deemed also to be references to Land Berlin.

### ARTICLE 6

(1) This Supplementary Treaty shall form an integral part of the Extradition Treaty.

(2) This Supplementary Treaty shall be subject to ratification and the instruments of ratification shall be exchanged at Bonn as soon as possible. It shall enter into force upon the exchange of instruments of ratification. It shall be subject to termination in the same manner as the Extradition Treaty.

In witness whereof, the undersigned, being duly authorized thereto by their respective Governments, have signed this Supplementary Treaty.

MOULATSIOTIS-EXT-00019

3

Done at Washington this twenty-first day of October 1986, in duplicate, in the English and German languages, both texts being equally authentic.

FOR THE UNITED STATES
OF AMERICA:

FOR THE FEDERAL REPUBLIC
OF GERMANY:

○

MOULATSIOTIS-EXT-00020

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 9785

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and the FEDERAL REPUBLIC
OF GERMANY

Signed at Bonn June 20, 1978

*with*

Protocol

ENGLISH TEXT ONLY



## NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89–497, approved
July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

". . . the Treaties and Other International Acts
Series issued under the authority of the Secretary of
State shall be competent evidence . . . of the treaties,
international agreements other than treaties, and proc-
lamations by the President of such treaties and inter-
national agreements other than treaties, as the case
may be, therein contained, in all the courts of law
and equity and of maritime jurisdiction, and in all the
tribunals and public offices of the United States, and
of the several States, without any further proof or
authentication thereof."

For sale by the Superintendent of Documents, U.S. Government Printing Office,
Washington, D.C. 20402.

MOULATSIOTIS-EXT-00022

# FEDERAL REPUBLIC OF GERMANY

## Extradition

*Treaty signed at Bonn June 20, 1978;*
*Transmitted by the President of the United States of America to the Senate January 19, 1979 (S. Ex. A, 96th Cong., 1st Sess.);*
*Reported favorably by the Senate Committee on Foreign Relations November 20, 1979 (S. Ex. Rep. No. 96–20, 96th Cong., 1st Sess.);*
*Advice and consent to ratification by the Senate November 29, 1979;*
*Ratified by the President December 20, 1979;*
*Ratified by the Federal Republic of Germany June 20, 1980;*
*Ratifications exchanged at Washington July 30, 1980;*
*Proclaimed by the President August 9, 1980;*
*Entered into force August 29, 1980.*
*With protocol.*

———————

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition was signed at Bonn on June 20, 1978, the text of which, in the English and German languages, is hereto annexed;

The Senate of the United States of America by its resolution of November 29, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 20, 1979, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of the Federal Republic of Germany;

It is provided in Article 34 of the Treaty that the Treaty shall enter into force thirty days after the exchange of the instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on July 30, 1980; and accordingly the Treaty will enter into force on August 29, 1980;

68-940 O—80               (1)               TIAS 9785

2

Now, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Treaty, to the end that it shall be observed and fulfilled with good faith on and after August 29, 1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the juris-diction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this ninth day of August in the year of our Lord one thousand nine hundred eighty and [SEAL] of the Independence of the United States of America the two hundred fifth.

JIMMY CARTER

By the President:
WARREN CHRISTOPHER
*Acting Secretary of State*

TIAS 9785

3

**TREATY**

between

The United States of America

and

the Federal Republic of Germany

Concerning Extradition

TIAS 9785

<u>4</u>

The United States of America

and

the Federal Republic of Germany −

desiring to provide for more effective cooperation between
the two States in the repression of crime and, specifically,
newly to regulate and thereby to facilitate the relations
between the two States in the area of extradition −

have agreed as follows:

<u>Article 1</u>

Obligation to Extradite

(1) The Contracting Parties agree to extradite to each
other subject to the provisions described in this
Treaty persons found in the territory of one of
the Contracting Parties who have been charged with
an offense or are wanted by the other Contracting
Party for the enforcement of a judicially pronounced
penalty or detention order for an offense committed
within the territory of the Requesting State.

(2) When the offense has been committed outside the
territory of the Requesting State, the Requested
State shall grant extradition subject to the pro-
visions described in this Treaty if either

a) its laws would provide for the punishment of
such an offense committed in similar circum-
stances, or

TIAS 9785

5

b) the person whose extradition is requested is a national of the Requesting State.

## Article 2

### Extraditable Offenses

(1) Extraditable offenses under this Treaty are:

a) Offenses described in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties;

b) Offenses, whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States and the laws of the Federal Republic of Germany.

In this connection it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offenses or denominate an offense by the same terminology.

(2) Extradition shall be granted in respect of an extraditable offense:

a) For prosecution, if the offense is punishable under the laws of both Contracting Parties by

TIAS 9785

MOULATSIOTIS-EXT-00027

6

deprivation of liberty for a maximum period
exceeding one year, or

b) For the enforcement of a penalty or a deten-
tion order, if the duration of the penalty
or detention order still to be served, or
when, in the aggregate, several such penalties
or detention orders still to be served, amount
to at least six months.

(3) Subject to the conditions set out in paragraphs
(1) and (2), extradition shall also be granted:

a) For attempts to commit, conspiracy to commit,
or participation in, an extraditable offense;

b) For any extraditable offense when, only for
the purpose of granting jurisdiction to the
United States Government, transportation,
transmission of persons or property, the
use of the mails or other means of communi-
cation or use of other means of carrying out
interstate or foreign commerce is also an
element of the specific offense.

(4) When extradition has been granted in respect of
an extraditable offense, it shall also be granted
in respect of any other extraditable offense which
would otherwise not be extraditable only by reason
of the operation of paragraph (2).

TIAS 9785

MOULATSIOTIS-EXT-00028

7

## Article 3

### Territorial Application

(1) A reference in this Treaty to the territory of a
Contracting Party is a reference to all territory
under its jurisdiction.

(2) A reference in this Treaty to the territory of a
Contracting Party shall furthermore include its
territorial waters and airspace and vessels and
aircraft registered with the competent authority
of this Contracting Party if any such vessel is
on the high seas or if any such aircraft is in
flight when the offense is committed.  For the
purpose of this Treaty an aircraft shall be con-
sidered to be in flight at any time from the moment
when all its external doors are closed following
embarkation until the moment when any such door is
opened for disembarkation.

## Article 4

### Political Offenses

(1) Extradition shall not be granted if the offense in
respect of which it is requested is regarded by the
Requested State as a political offense, an offense
of a political character or as an offense connected
with such an offense.

TIAS 9785

68-940 O - 80 - 2

8

(2) Extradition also shall not be granted if the Re-
quested State has substantial grounds for believing
that the request for extradition has, in fact, been
made with a view to try or punish the person sought
for an offense mentioned in paragraph (1).

(3) For the purpose of this Treaty the following offenses
shall not be deemed to be offenses within the meaning
of paragraph (1):

   a) A murder or other willful crime, punishable
      under the laws of both Contracting Parties by
      a penalty of at least one year, against the
      life or physical integrity of a Head of State
      or Head of Government of one of the Contracting
      Parties or of a member of his family, including
      attempts to commit such an offense, except in
      open combat;

   b) An offense which the Contracting Parties or
      the Requesting State have the obligation to
      prosecute by reason of a multi-lateral inter-
      national agreement.

### Article 5

#### Military Offenses

Extradition shall not be granted if the offense in respect
of which it is requested is purely a military offense.

TIAS 9785

9

## Article 6

### Fiscal Offenses

If the competent executive authority of the Requested
State determines that an offense for which extradition
has been requested represents an offense as described
in Item No. 27 of the Appendix to this Treaty and that
extradition for such an offense would be contrary to
the public policy or other essential interests of that
State, extradition may be refused even though the offense
also falls into one of the other categories of extradi-
table offenses under this Treaty.

## Article 7

### Extradition of Nationals

(1) Neither of the Contracting Parties shall be bound
    to extradite its own nationals.  The competent ex-
    ecutive authority of the Requested State, however,
    shall have the power to grant the extradition of
    its own nationals if, in its discretion, this is
    deemed proper to do and provided the law of the
    Requested State does not so preclude.

(2) The Requested State shall undertake all available
    legal measures to suspend naturalization proceedings
    in respect of the person sought until a decision
    on the request for his extradition and, if that re-
    quest is granted, until his surrender.

TIAS 9785

10

(3) If the Requested State does not extradite its own
    national, it shall, at the request of the Requesting
    State, submit the case to its competent authorities
    in order that proceedings may be taken if they are
    considered appropriate.  If the Requested State re-
    quires additional documents or evidence, such docu-
    ments or evidence shall be submitted without charge
    to that State.  The Requesting State shall be informed
    of the result of its request.

### Article 8

#### Prior Jeopardy for Same Offense

Extradition shall not be granted when the person whose
extradition is requested has been tried and discharged
or punished with final and binding effect by the com-
petent authorities of the Requested State for the
offense for which his extradition is requested.

### Article 9

#### Lapse of Time

Extradition shall not be granted if at the time the Re-
quested State receives the request for extradition the
prosecution, or the enforcement of the penalty or of
the detention order, has become barred by lapse of time
under the law of the Requesting State.

TIAS 9785

11

## Article 10

Jurisdiction of the Requested State

(1) Extradition may be refused if the person sought is proceeded against in the Requested State for the offense for which extradition is requested.

(2) The fact that the competent authorities of the Requested State have decided not to prosecute the person sought for the offense for which extradition is requested or decided to discontinue any criminal proceedings which have been initiated shall not preclude extradition.

## Article 11

Complaint and Authorization

The obligation to extradite shall not be affected by the absence of any complaint or any authorization as a result of an offense if such complaint or such authorization is required under the law of the Requested State.

## Article 12

Capital Punishment

When the offense for which extradition is requested is punishable by death under the laws of the Requesting State

TIAS 9785

MOULATSIOTIS-EXT-00033

12

and the laws of the Requested State do not permit such
punishment for that offense, extradition may be refused
unless the Requesting State furnishes such assurances as
the Requested State considers sufficient that the death
penalty shall not be imposed, or, if imposed, shall not
be executed.

### Article 13

#### Extraordinary Courts

(1) An extradited person shall not be tried by an
    extraordinary court in the territory of the Re-
    questing State.

(2) Extradition shall not be granted for the enforce-
    ment of a penalty imposed, or detention ordered,
    by an extraordinary court.

### Article 14

#### Channel of Communication; Extradition Documents

(1) The request for extradition, any subsequent docu-
    ments and all other communications shall be trans-
    mitted through the diplomatic channel unless otherwise
    provided by this Treaty.

(2) The request shall be accompanied by:

TIAS 9785

13

a) All available information concerning the identity and nationality of the person sought;

b) The text of all applicable provisions of law of the Requesting State concerning the definition of the offense, its punishment and the limitation of legal proceedings or the enforcement of penalties; and

c) A statement by a competent authority describing the measures taken, if any, that have interrupted the period of limitation under the law of the Requesting State.

(3) A request for the extradition of a person sought for the purpose of prosecution shall be accompanied, in addition to the documents provided for in paragraph (2), by:

a) A warrant of arrest issued by a judge of the Requesting State and such evidence as, according to the law of the Requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving that the person requested is the person to whom the warrant of arrest refers; and

b) A summary statement of the facts of the case unless they appear from the warrant of arrest.

TIAS 9785

MOULATSIOTIS-EXT-00035

14

(4) A request for the extradition of a person sought by
reason of a judgment of guilt for the imposition or
enforcement of a penalty or detention order shall be
accompanied, in addition to the documents provided
for in paragraph (2), by:

a) If the judgment handed down in the territory
of the Requesting State contains only a deter-
mination of guilt, this judgment, confirmation
that the judgment has final and binding effect
and a warrant of arrest issued by a competent
authority of the Requesting State;

b) If the judgment handed down in the territory
of the Requesting State contains the determin-
ation of guilt and the sentence imposed, a copy
of this judgment of conviction as well as the
confirmation that this judgment has final and
binding effect and is enforceable and a state-
ment of the portion of the sentence that has
not been served.

(5) A witness' statement taken down in writing or other
evidence, not under oath, shall be admitted in evi-
dence as a statement made or evidence given under
oath if it is certified that the person making the
statement or giving the evidence was warned by a
competent authority that any false, misleading or
incomplete declaration would render him liable to
punishment.

TIAS 9785

15

## Article 15

Additional Evidence

(1) If the Requested State considers that the evidence
furnished in support of the request for the extra-
dition of a person sought is not sufficient to fulfill
the requirements of this Treaty, that State shall re-
quest the submission of necessary additional evidence;
it may fix a time limit for the submission of such
evidence and, upon the Requesting State's application,
for which reasons shall be given, may grant a
reasonable extension of the time limit.

(2) If the person sought is under arrest and the addi-
tional evidence or information submitted as aforesaid
is not sufficient, or if such evidence or information
is not received within the period specified by the
Requested State, he shall be discharged from custody.
However, such discharge shall not bar a subsequent
request in respect of the same offense.  In this
connection it shall be sufficient if reference is
made in the subsequent request to the supporting
documents already submitted provided these documents
will be available at the extradition proceedings on
this subsequent request.

TIAS 9785

MOULATSIOTIS-EXT-00037

16

## Article 16

Provisional Arrest

(1) In case of urgency either Contracting Party may
apply for the provisional arrest of the person sought
before the request for extradition has been submitted
to the Requested State through the diplomatic channel.
The request for provisional arrest may be made either
through the diplomatic channel or directly between
the United States Department of Justice and the Minister
of Justice of the Federal Republic of Germany.

(2) The application for provisional arrest shall state
that a warrant of arrest as mentioned in paragraph
(3) a) of Article 14, or a judgment as mentioned in
paragraph (4) a) or b) of Article 14, exists and that
it is intended to make a request for extradition. It
shall also state the offense for which extradition will
be requested and when and where such offense was com-
mitted and shall give all available information con-
cerning the description of the person sought and his
nationality.  The application shall also contain such
further information, if any, as would be necessary to
justify the issuance of a warrant of arrest in the
Requested State had the offense been committed, or
the person sought been convicted, in that State.

TIAS 9785

17

(3) On receipt of an application for provisional arrest
the Requested State shall take the necessary steps
to secure the arrest of the person sought.

(4) Provisional arrest shall be terminated if, within
a period of 40 days after the apprehension of the
person sought, the Requested State has not received
the request for extradition and the documents men-
tioned in Article 14.  This period may be extended,
upon the Requesting State's application, for up to
an additional 20 days after the apprehension of the
person sought.

(5) The termination of provisional arrest pursuant to
paragraph (4) shall not prejudice the extradition of
the person sought if the extradition request and the
supporting documents mentioned in Article 14, insofar
as they were not submitted in a timely manner, are
later delivered.  In this connection, reference may
be made to the extradition request and the supporting
documents which have already been transmitted to the
Requested State.

### Article 17

Requests for Extradition Made by Several States

(1) A Contracting Party which has received concurrently
requests for the extradition of the same person either
for the same offense, or for different offenses, from

TIAS 9785

MOULATSIOTIS-EXT-00039

18

the other Contracting Party and from a third State shall make its decision having regard to all the circumstances and especially the possibility of a subsequent re-extradition to another Requesting State, the relative seriousness and place of commission of the offenses, the nationality of the person sought and the provisions of any extradition agreements between the Requested State and the Requesting States.

(2) If the Requested State reaches a decision at the same time upon extradition to one of the Requesting States and on re-extradition to another Requesting State, it shall communicate that decision on re-extradition to each of the Requesting States.

## Article 18

### Simplified Extradition

If the extradition of a person sought to the Requesting State is not obviously precluded by the laws of the Requested State and provided the person sought irrevocably agrees in writing to his extradition after personally being advised by a judge or competent magistrate of his rights to formal extradition proceedings and the protection afforded by them that he would lose, the Requested State may grant his extradition without a formal extradition proceeding having taken place.  In this case Article 22(1) shall not be applicable.

TIAS 9785

19

## Article 19

Decision

(1) The Requested State shall promptly communicate
to the Requesting State the decision on the request
for extradition.

(2) The Requested State shall give the reasons for any
complete or partial rejection of the request for
extradition.

## Article 20

Delayed Decision and Surrender

The Requested State may, after a decision on the request
has been rendered by a competent court, defer the surrender
of the person whose extradition is requested, when that
person is being proceeded against or is serving a sentence
in the territory of the Requested State for a different
offense, until the conclusion of the proceedings and the
full execution of any punishment he may be or may have
been awarded.  In this case the Requested State shall
advise the Requesting State.

MOULATSIOTIS-EXT-00041

20

### Article 21

Surrender of the Person Sought

(1) If the extradition has been granted, surrender
of the person sought shall take place within such
time as may be prescribed by the laws of the Re-
quested State.  If no time period for surrender is
prescribed by the laws of the Requested State,
surrender shall take place within 30 days from
the date on which the Requesting State has been
notified that the extradition has been granted.
The competent authorities of the Contracting
Parties shall agree on the time and place of the
surrender of the person sought.

(2) If the person sought is not removed from the terri-
tory of the Requested State within the time required
under paragraph (1), he may be set at liberty.  The
Requested State may subsequently refuse to extradite
the person sought for the same offense.

(3) If circumstances beyond its control prevent a Con-
tracting Party from timely surrendering or taking
delivery of the person to be extradited, it shall
notify the other Contracting Party before the ex-
piration of the time limit.  In such a case the
competent authorities of the Contracting Parties
may agree upon a new date for the surrender.

TIAS 9785

21

## Article 22

Rule of Speciality

(1) A person who has been extradited under this Treaty
shall not be proceeded against, sentenced or de-
tained with a view to carrying out a sentence or
detention order for any offense committed prior to
his surrender other than that for which he was
extradited, nor shall he be for any other reason
restricted in his personal freedom, except in
the following cases:

a) When the State which extradited him consents
thereto.  A request for consent shall be sub-
mitted, accompanied by the documents mentioned
in Article 14 and a record established by a
judge or competent officer of the statement
made by the extradited person in respect of
the request for consent.  If under the law
of the Requesting State the issuance of a
warrant of arrest for the offense for which
extradition is sought is not possible, the
request may instead be accompanied by a
statement issued by a judge or competent
officer establishing that the person sought
is strongly suspected of having committed
the offense.

TIAS 9785

MOULATSIOTIS-EXT-00043

22

b) When such person, having had the opportunity
to leave the territory of the State to which
he has been surrendered, has not done so
within 45 days of his final discharge or
has returned to that territory after leaving
it. A discharge under parole or probation
without an order restricting the freedom of
movement of the extradited person shall be
deemed equivalent to a final discharge.

(2) The State to which the person has been extradited
may, however, take any legal measures necessary
under its law, in order to proceed _in absentia_,
to interrupt any lapse of time or to record a
statement under paragraph (1) a).

(3) If the offense for which the person sought was
extradited is legally altered in the course of
proceedings, he shall be prosecuted or sentenced
provided the offense under its new legal descrip-
tion is:

a) Based on the same set of facts contained in
the extradition request and its supporting
documents; and

b) Punishable by the same maximum penalty as,
or a lesser maximum penalty than, the
offense for which he was extradited.

TIAS 9785

MOULATSIOTIS-EXT-00044

23

## Article 23

### Re-extradition to a Third State

(1) Except as provided for in Article 22 (1) b), the
Requesting State shall not, without the consent of
the Requested State, re-extradite to a third State
a person extradited to the Requesting State and
sought by the said third State in respect of an
offense committed prior to his surrender.

(2) A request for consent to re-extradition to a third
State shall be accompanied by the documents sup-
porting the request for extradition made by the
third State, if the Requested State needs these
documents for its decision.  These documents shall
conform to the documents mentioned in Article 14
of this Treaty.

## Article 24

### Information on the Result of the Criminal Proceedings

The Requesting State shall upon demand inform the Re-
quested State of the result of the criminal proceedings
against the extradited person and send a copy of the
final and binding decision to that State.

TIAS 9785

MOULATSIOTIS-EXT-00045

24

## Article 25

### Surrender of Property

(1) To the extent permitted under the laws of the
Requested State and subject to the rights of that
State or of third parties, which shall be duly re-
spected, all articles which may serve as evidence,
or which have been acquired as a result of an
offense, or have been obtained as consideration
for such articles, and which at the time of the
arrest are found in the possession of the person
sought or are discovered subsequently, shall be
surrendered if extradition of the person sought
is granted.  Surrender of such articles shall be
possible even without any special request and,
if possible, at the same time that the person
sought is surrendered.

(2) Subject to the conditions provided in paragraph
(1), the articles mentioned therein shall be
surrendered even if the person sought cannot be
surrendered owing to his death or escape.

(3) The Requested State may condition the surrender
of articles upon a satisfactory assurance from
the Requesting State that the articles will be
returned to the Requested State as soon as possible.

TIAS 9785

25

## Article 26

Transit

(1) Transit of a person who is the subject of extra-
dition from a third State through the territory
of a Contracting Party to the territory of the
other Contracting Party shall be granted on sub-
mission of a request, provided that the offense
concerned is an extraditable offense under Article
2 and that the Contracting Party requested to
grant transit does not consider the offense to be
one covered by Articles 4 or 5.

(2) Transit of a national of the Requested State
may be refused if, in the opinion of that State,
it is inadmissible under its law.

(3) Subject to the provisions of paragraph (4), the
request for transit must be accompanied by a
warrant of arrest issued by a judge or competent
officer of the Requesting State and by a statement
as mentioned in Article 14 (3) b).

(4) If air transport is used, the following provisions
shall apply:

TIAS 9785

MOULATSIOTIS-EXT-00047

26

a) When no intermediate stop is foreseen, the
   Contracting Party requesting transit shall
   notify the other Contracting Party, certify
   that one of the documents mentioned in
   Article 14, paragraph (3) a) or paragraph
   (4) a) or b) exists, and state whether
   the person whose transit is being notified
   is a national of the Contracting Party over
   the territory of which the flight is to be
   made.  In the case of an unscheduled landing
   such notification shall have the effect of
   a request for provisional arrest as provided
   for in Article 16; thereafter a formal re-
   quest for transit shall be made.

b) When an intermediate stop is planned, the
   Contracting Party requesting transit shall
   submit a formal request for transit.

### Article 27

Applicable Law

Except where this Treaty otherwise provides, the law
of the Requested State shall be applicable with respect
to provisional arrest, extradition and transit.

TIAS 9785

27

### Article 28

Language to be Used

The documents transmitted in the application of this Treaty shall be in the language of the Requesting State accompanied by a certified translation into the language of the Requested State.  The expense of translation shall be borne by the Requesting State.

### Article 29

Certification

A warrant of arrest and depositions or other evidence, given on oath or in a manner described in Article 14 (5), and the judgment of conviction and of the sentence, if it has been passed, or certified copies of these documents, shall be admitted in evidence in the examination of the request for extradition when:

a) In the case of a request emanating from the Federal Republic of Germany, they are signed by a judge or competent officer, are authenticated by the official seal of the Federal Minister of Justice and are certified by the competent diplomatic or consular officer of the United States in the Federal Republic of Germany, or

TIAS 9785

28

b) In the case of a request emanating from the
United States, they are signed by a judge
or competent officer, are authenticated by
the official seal of the Department of State
and are certified by the competent diplomatic
or consular officer of the Federal Republic
of Germany in the United States.

## Article 30

### Expenses

Expenses arising from the transportation of a person
sought to the Requesting State shall be borne by that
State.  No other pecuniary claim arising from an extra-
dition or a transit request shall be made by the Re-
quested State against the Requesting State.  The
appropriate legal officers of the State in which the
extradition proceedings take place shall, by all legal
means within their power, assist the Requesting State
before the competent judges and officers.

## Article 31

### Scope of Application

This Treaty shall apply to offenses encompassed by
Article 2 committed before as well as after the date
this Treaty enters into force.  Extradition shall not
be granted, however, for an offense committed before
this Treaty enters into force which was not an offense
under the laws of both Contracting Parties at the time
of its commission.

TIAS 9785

29

## Article 32

### Definitions

For the purpose of this Treaty, the term

a) "Penalty" means deprivation of liberty as a
   result of a sentence upon conviction for an
   offense;

b) "Detention order" means any order involving
   deprivation of liberty which has been made by
   a criminal court in addition to or instead of
   a penalty.

## Article 33

### Berlin Clause

(1) This Treaty shall also apply to Land Berlin pro-
    vided that the Government of the Federal Republic
    of Germany does not make a contrary declaration to
    the Government of the United States of America
    within three months of the date of entry into force
    of this Treaty.

(2) Upon the application of this Treaty to Land Berlin,
    references in the Treaty to the Federal Republic of
    Germany or to the territory thereof shall be deemed
    also to be references to Land Berlin.

TIAS 9785

MOULATSIOTIS-EXT-00051

30

## Article 34

Ratification; Coming Into Force; Denunciation

(1) This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged in Washington, D.C., as soon as possible.

(2) This Treaty shall enter into force 30 days after the exchange of the instruments of ratification.[1]

(3) Between the Contracting Parties this Treaty shall terminate and replace the Extradition Treaty between the United States of America and Germany signed at Berlin July 12, 1930.[2]

(4) This Treaty shall continue in force until the expiration of one year from the date on which written notice of termination is given by one Contracting Party to the other.

Done at Bonn this 20th day of June, 1978, in duplicate in the English and German languages, both texts being equally authentic.

For the
United States of America

For the
Federal Republic of Germany

*[signature]*[3]     *[signature]*[4]

*[signature]*[5]

---

[1] Aug. 29, 1980.
[2] TS 836; 47 Stat. 1862.
[3] Walter J. Stoessel, Jr.
[4] Guenther Van Well.
[5] Guenther Erkel.

TIAS 9785

31

## APPENDIX

1. Murder.

2. Manslaughter.

3. Aggravated wounding, injury, or assault, even when loss of life results; wounding or injuring with intent to cause grievous bodily harm.

4. Illegal abortion.

5. Kidnapping; abduction; false imprisonment; child-stealing.

6. Rape, indecent assault; incest; bigamy.

7. Unlawful sexual acts with or upon children under the age specified by the laws both of the Requesting and Requested States.

8. Procuration.

9. Libel.

10. Willful non-support or willful abandonment of a minor or other dependent person when by reason of such non-support or abandonment the life of that minor or other dependent person is or is likely to be endangered.

11. Robbery; larceny; burglary; embezzlement; extortion.

12. Malicious damage to property.

13. Fraud, including offenses against the laws relating to the unlawful obtaining of money, property or securities, to fiduciary relationships or to exploitation of minors.

TIAS 9785

MOULATSIOTIS-EXT-00053

32

14. Offenses against the laws relating to forgery, including the making of forged documents or records, whether official or private, or the uttering or fraudulent use of such documents or records.

15. Receiving, possessing, or transporting for personal benefit any money, valuable securities, or other property, knowing the same to have been unlawfully obtained.

16. Offenses relating to counterfeiting.

17. Perjury, including subornation of perjury; false statements, either written or oral, whether or not under oath, made to a judicial authority or to a government agency or office.

18. Arson.

19. Unlawful obstruction of juridical proceedings or proceedings before governmental bodies or interference with an investigation of a violation of a criminal statute, by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator.

20. a) Unlawful abuse of official authority which results in bodily injury or deprivation of life, liberty or property of any person.
    b) Unlawful injury or intimidation in connection with, or interference with, voting or candidacy for public office, jury service, government employment, or the receipt or enjoyment of benefits provided by government agencies.

TIAS 9785

MOULATSIOTIS-EXT-00054

33

21. Facilitating or permitting the escape of a person from custody; prison mutiny.

22. Offenses against the laws relating to bribery.

23. Offenses against the laws relating to civil disorders.

24. Offenses against the laws relating to illegal gambling enterprises.

25. Any act willfully jeopardizing the safety of any person traveling upon a railway or in any aircraft or vessel or other means of transportation.

26. Piracy, by statute or by the law of nations; mutiny or revolt aboard an aircraft or vessel against the authority of the captain or commander of such aircraft or vessel; any seizure or exercise of control, by force or violence or threat of force or violence, of an aircraft or vessel.

27. a) Offenses against the laws relating to importation, exportation or transit of goods, articles, or merchandise.

    b) Offenses relating to willful evasion of taxes and duties.

    c) Offenses against the laws relating to international transfers of funds.

28. Offenses against the bankruptcy laws.

29. Offenses against the laws relating to narcotic drugs, Cannabis sativa L., Hallucinogenic drugs, cocaine and its derivatives, and other dangerous drugs and chemicals.

30. Offenses against the laws relating to the illicit manufacture of or traffic in poisonous chemicals or substances injurious to health.

TIAS 9785

MOULATSIOTIS-EXT-00055

34

31. Offenses against the laws relating to firearms, ammuni-
tion, explosives, incendiary devices or nuclear materials.

32. Offenses against the laws relating to the sale or trans-
portation or purchase of securities or commodities.

33. Any other act for which extradition may be granted in
accordance with the laws of both Contracting Parties.

TIAS 9785

MOULATSIOTIS-EXT-00056

35

## PROTOCOL

At the time of signing this day of the Extradition
Treaty between the United States of America and the
Federal Republic of Germany the undersigned plenipoten-
tiaries have agreed that Article 4(3)(b) of the Treaty
and Item No. 20(b) of the Appendix thereto are to be
interpreted as follows:

(1) With respect to the interpretation of Article
    4(3)(b) the Contracting Parties mutually agree that
    at the time of the conclusion of the Treaty, this
    provision has reference, for example, to the Conven-
    tion for the Suppression of Unlawful Seizure of
    Aircraft of December 16, 1970, [1] the Convention for
    the Suppression of Unlawful Acts Against the Safety
    of Civil Aviation of September 23, 1971, [2] and the
    Convention on the Prevention and Punishment of
    Crimes Against Internationally Protected Persons
    including Diplomatic Agents of December 14, 1973. [3]

(2) The Contracting Parties mutually agree to interpret
    Item No. 20(b) of the Appendix to the Treaty as
    meaning that the terms "jury service" and "ehren-
    amtlicher Richter" apply to persons who in the
    legal practice of both Contracting Parties have
    corresponding functions (in the United States of
    America: members of a jury; in the Federal Republic
    of Germany: members of a court who are not judges by
    profession).

_____

[1] TIAS 7192; 22 UST 1641.
[2] TIAS 7570; 24 UST 564.
[3] TIAS 8532; 28 UST 1975.

TIAS 9785

MOULATSIOTIS-EXT-00057

36

Done at Bonn this 20th day of June, 1978, in duplicate
in the English and German languages, both texts being
equally authentic.

For the                                For the
United States of America              Federal Republic of Germany

MOULATSIOTIS-EXT-00058